### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (JLP) |
| | ) | |
| Reorganized Debtor. | ) | **Re: Docket No. 2730** |
| _____ | ) | |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-51063 (JLP) |
| | ) | |
| AMMONDSON, *et al.*, | ) | **Re: Docket Nos. 1 and 3** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION WITH RESPECT TO
### CERTAIN SUPPLEMENTAL RETIREMENT BENEFITS[1]

On January 31, 2005, NorthWestern Corporation ("NOR") filed Debtor's Second

Motion (I) Authorizing Debtor to Terminate Certain Supplemental Retirement Agreements

Pursuant to 11 U.S.C. Sections 105(a) and 363; (II) Seeking Allowance of Certain Claims; and

(III) Objecting to and Seeking to Disallow and Expunge Claim Number 825 Pursuant to 11

U.S.C. Section 502(b)(1) [Docket No. 2730] (the "Motion").[2]  For purposes of this

Memorandum, the pertinent portion of the Motion involves former employees of the Montana

Power Company ("MPC"), NOR's predecessor in interest, who were receiving pension benefits

from NOR through December 31, 2004, at which point NOR ceased payments of these benefits.

---

[1]  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law
pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2]  This Memorandum and corresponding Order do not decide any issues regarding claim number
825 filed by Murphy.

The pension class includes Ammondson, Couture (widow), Christensen, Dee, Doran, German, Gilder, Lahr, Magone, Meldahl, Miller, Quinn (widow), Ralph, Rawls, Regan, Smith, Thorson, Van Gelder, Verbael, Worring and Woy (hereinafter, the "Pensioners"). NOR's Motion seeks to terminate the pension payments because "the it is receiving no benefit from the agreements." (Motion, p. 2). NOR proposes to fix a present value of each pension totaling $2,494,962.00, and distribute to each Pensioner common stock in lieu of any further cash payments. The Pensioners each executed separate pension agreements upon retirement from MPC, so the Motion sets forth a schedule of each pension, which includes a list of payments totaling $357,178.00 that NOR has paid since filing the bankruptcy petition (September 14, 2003 through December 31, 2004). Each pension agreement is separate and distinct with respect to the individual pensioner and therefore requires separate administration. According to the Motion, prior to December 31, 2004, NOR made the individual payments from its general assets, since each pension has no reserve and, in that sense, the pensions are unfunded. NOR concedes each agreement represents a general unsecured obligation incurred prior to the petition date. NOR therefore argues that the pension obligations are Class 9 general unsecured claims under the chapter 11 plan of reorganization (the "Plan"), which was confirmed by order entered October 19, 2004 [Docket No. 2238].

NOR contends this Court has jurisdiction over this matter and seeks termination of the agreements under section 365 of the Bankruptcy Code,[3] which governs rejection or assumption of executory contracts, and like section 363(c), requires a business judgment standard, where

---

[3] Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code ("Code"), 11 U.S.C. § 101 *et seq.*

rejection of an executory contract is allowed if it will benefit the estate, citing *In re Farmland Industries, Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003), and other case authorities. The Motion further contends that section 1114(a) does not apply to the pension agreements because each pension agreement is based upon retirement and is not a payment for health and welfare benefits under the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1002(1) and 3(1).

The pending Motion comes before the Court in an unusual manner. Rather than noticing the Motion for hearing, NOR filed an adversary complaint April 25, 2005 [Docket No. 1, Adv. Pro. No. 05-51063] (the "Complaint") , naming NOR as plaintiff and each pensioner as a defendant. Contemporaneously, NOR filed a Motion for Order to Show Cause Pending Hearing and Preliminary Injunction Staying State Court Action [Docket No. 3, Adv. Pro. No. 05-51063]. The State Court Action was filed on April 1, 2005, by each pensioner as a plaintiff against NOR in the Montana Second Judicial District Court, Butte-Silver Bow County, Cause No. DV-05-97. The named defendants in the State Court Action include Gary C. Drook, Michael J. Hanson, Brian B. Biro and Roger P. Schrum, as individuals and as corporate officers of NOR. The state court complaint parrots the Pensioners' Objection, Response and Counterclaims to NOR's Motion to terminate the pension benefits. [Docket No. 2952]. The Complaint and Counterclaims allege breach of contract, breach of the covenant of good faith and fair dealing under Montana law, malicious prosecution and abuse of process, unjust enrichment and a challenge to NOR's calculation of the amount of the present value of each pension agreement. In addition, the Pensioner's Response asserts that the NOR Plan was confirmed October 19, 2004, and the "Effective Date" under the Plan occurred November 1, 2004, as alleged by NOR, so that

3

under the confirmed Plan provisions, NOR must file any objections to claims within ninety (90) days of the Effective Date, namely January 30, 2005. The Pensioners thus assert the pending Motion to terminate the pension benefits, filed January 31, 2005, at 10:35 a.m., is thus untimely and barred.

The Pensioners' Response asserts: (1) the Montana Public Service Commission ("PSC") granted MPC, and thus NOR, utility rates based upon costs of services, which included the pension benefits, so that the rates income to pay these benefits is born by the rate payers; (2) NOR specifically asserted the benefit payments as part of the purchase of assets from MPC; (3) not one of the retirees was listed or scheduled at any time in the Debtor's schedules of secured and unsecured creditors, except for Van Gelder, who is listed on Schedule "G" as a party to an executory contract, and at no time prior to January 31, 2005, was Van Gelder given any notice of rejection of such executory contract. Thus, argue the Pensioners, the failure to schedule any of the retirees as creditors or parties to an executory contract before confirmation of the Plan and NOR's unilateral termination of the payments on December 31, 2004, without any prior notice, is fatal to NOR's present intention to terminate the benefits, because the Retiree's benefits "emerged unaffected by Plan confirmation, and the Court does not have jurisdiction over Debtor's Motion to terminate them after the Plan became effective." (Response, p. 5).

Pursuant to NOR's Motion, this Court on April 26, 2005, issued an order to show cause why the Pensioners should not be enjoined from continued prosecution of the State Court Action and stayed of all proceedings in that State Court Action until the Court could hear the merits of the Motion, which was to be set for hearing on May 3, 2005, at 9:30 a.m [Docket No. 8, Adv. Pro. No. 05-51063]. NOR's Motion and adversary complaint place into issue this Court's

4

jurisdiction over NOR's attempt to terminate the pension benefits. NOR's memorandum relies

heavily on a Plan provision, which provides, in pertinent part:

> Following the Effective Date, the Bankruptcy Court shall have the exclusive
> jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and
> this Plan pursuant to, and for the purposes of, Section 105(a) and 1142 of the
> Bankruptcy Code and for, among other things, the following purposes:
>
> * * *
>
> (a) to hear and determine any and all objections to the allowance any Claims or
> any controversies as to the classification of any Claims;
>
> * * *
>
> (e) to enforce the provisions of this Plan, including the injunction, exculpation and
> releases provided for in this Plan; . . . .

(Plan, § 13.1 at 75-76).

NOR's memorandum alludes to the Second Amended and Restated Disclosure Statement

filed August 31, 2004 [Docket No. 2021] (the "Disclosure Statement"), wherein NOR claims that

it indicated its intention to terminate all of its non-qualified pension plans, with the exception of

the "Family Protector Plan."[4]  (Disclosure Statement, § II.C at 22).  Assuming each Pensioner

was in fact served with the Disclosure Statement, which is not the case, the provision NOR relies

upon states in full:

> (2)     Non-Qualified Compensation and Benefit Plans.  At present the Debtor
> anticipates rejecting and terminating certain non-qualified plans.  The
> Debtor expects to file motions seeking orders to permit these
> modifications and/or terminations.[25]   The non-qualified plans the Debtor
> intends to reject include, but are not limited to: (i) the Montana Power
> Benefit Restoration Plan; (ii) the Executive Long Term Incentive Plan;

---

[4] The "Family Protector Plan" is not involved in the present dispute.

5

> (iii) the Cash Balance Supplemental Executives Retirement Plan; and (iv)
> the Pension Equalization Plan. As of the date of the Petition,
> approximately $8.1 million is owed under such plans.

Footnote 25 reads:

> In reviewing the anticipated termination and/or rejection of certain non-qualified
> plans, the Debtor has determined that approximately ninety (90) directors, officers
> and retirees are likely to be impacted. Those impacted include, but are not limited
> to, the following: (i) Randy Darcy; (ii) Gary Drook; (iii) Michael Hanson; (iv)
> Richard Hylland; (v) Jerry Johnson; (vi) Merle Lewis; (vii) Dennis Lopach; (viii)
> Larry Ness; (ix) Dan Newell; (x) Marilyn Seymann; (xi) Bruce Smith; (xii) Bart
> Thielbar; (xiii) Greg Trandem; and (xiv) John Van Camp.

It is apparent from the above that the present affected pensioners were not specifically mentioned

to be included in such class. Indeed, none of the Pensioners were put on notice concerning such

action until January 31, 2005, well after approval of the Disclosure Statement, confirmation of

the Plan and after NOR filed with this the Clerk of this Court its Notice of Substantial

Confirmation of the Plan [Docket No. 2519, entered December 29, 2004]. NOR's argument in

this regard is specious, as the Disclosure Statement does not bind anyone to any legal status or

obligation. Only the Confirmed Plan has that legal effect under section 1141(a), which provides:

Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed

plan bind the debtor, any entity acquiring property under the plan, and any creditor, equity

security holder, or general partner in, the debtor, whether or not the claim or interest of such

creditor, equity security holder, or general partner is impaired under the plan and whether or not

such creditor, equity security holder, or general partner has accepted the plan. Thus, this Court

must look to the Plan, not the Disclosure Statement, to determine what affect the Confirmation

Order had upon the rights of the Pensioners.

NOR argues that the Court has "exclusive jurisdiction of the claims asserted by

6

Defendants." NOR then states that by asserting the counterclaims against NOR, "Defendants

have brought claims against NOR in its Chapter 11 case," and that filing a claim triggers the

allowance and disallowance of claims process. I reject such argument.

NOR cites *In re Resorts International, Inc.*, 372 F.3d 154, 1692-63 (3d Cir. 2004), for the

unremarkable proposition that one who invokes a substantive right provided in title 11 or a right

that by its nature could arise only in the context of a bankruptcy case results in a core proceeding

under 28 U.S.C. section 157. *Resorts International* is indeed instructive and determinative of the

jurisdiction issue, but not in the context asserted by NOR. *Resorts International* involved a

malpractice complaint brought by the Liquidating Trustee created under a confirmed chapter 11

plan against accountants of the estate. The issue in Resorts International was whether the action

was core or non-core, and equally important was the "related to" concepts applicable in the post-

confirmation context. After citing *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir.1984), the

*Resorts International* Court held:

> As noted, *Pacor* and its progeny provide the analytical framework for determining
> "related to" jurisdiction. But most of the cases decided under Pacor do not arise
> post-confirmation or even after the creation of a litigation trust. . . .
>
> After confirmation of a reorganization plan, retention of bankruptcy jurisdiction
> may be problematic. . . . At the most literal level, it is impossible for the bankrupt
> debtor's estate to be affected by a post-confirmation dispute because the debtor's
> estate ceases to exist once confirmation has occurred. . . . Unless otherwise
> provided by the plan or order confirming the plan, "the confirmation of a plan
> vests all of the property of the estate" in the reorganized debtor. 11 U.S.C. §
> 1141(b).

372 F.3d at 164-65 (internal citations omitted). Recognizing that courts "do not usually apply

*Pacor*'s 'effect on the bankruptcy estate' test so literally as to entirely bar post-confirmation

bankruptcy jurisdiction," *id.* at 165, the Third Circuit then adopted the following standard of

review for post-confirmation issues in dispute:

> Though courts have varied the standard they apply post-confirmation, the essential inquiry appears to be whether there is a *close nexus* to the bankruptcy *plan* or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter.

*Id.* at 166-67 (emphasis added). *Resorts International* then analyzed varying case circumstances where "close nexus" was prevalent, and where "close nexus" lacked jurisdiction. The Third Circuit cited *Montana v. Goldin (In re Pegasus Gold Corp.)*, 296 B.R. 227 (D. Nev. 2003), where because of the plan's contractor's failure, and its inability to retain debtors employees to complete the reclamation work required under the plan, such breach by Montana "undermine[d] the Plan's objectives for reorganization and the payment of creditors." *Resorts International*, 372 F.3d at 168 (quoting *Pegasus*, 296 B.R. at 233-35). The Pegasus district court decision was upheld on appeal on the "close nexus" issue, adopting *Resorts International*, but reversed on sovereign immunity grounds. *In re Pegasus Gold*, 394 F.3d 1189 (9th Cir. 2005). It is important to understand that the Pegasus facts "could affect the implementation and execution of the Plan itself, which specifically called for the creation of RSC [the chosen environmental contractor for reclamation work] and the transfer of debtor money to fund it," so that "close nexus" to the bankruptcy "related to" jurisdiction was established. *Id.* at 1194.

Turning again to *Resorts International*, the opposite result occurred, where the Third Circuit found that the "malpractice claims will not affect the interpretation, implementation, consummation, execution, or administration of the Plan." 372 F.3d at 170-71.

And so it is with the case *sub judice*. NOR filed on December 30, 2004, a notice of substantial consummation of the Plan, meaning all matters required to be done under the Plan, and pursuant to the Plan, had been accomplished. Nowhere are the claims of the Pensioners

8

recognized as affecting consummation or implementation of the Plan.

Moreover, certain and specific Plan provisions, not cited by NOR, clearly affect a result

that this matter has no "related to" jurisdiction that allows this Court to proceed to resolution of

the pending motion to terminate the pension benefits or the adversary action filed by NOR.

Under the Confirmed Plan (as opposed to any recitations of the Disclosure Statement), Section

10.7 specifically passes on the future resolution of disputes in another forum by the following:

>      10.7    No Release as to Pension Plans.  Notwithstanding any language to
> the contrary in the Debtor's Plan, nothing in the Plan shall be construed as
> releasing, discharging, or otherwise relieving the Debtor or any other party who
> may be a fiduciary with respect to the Pension Plans of any potential liability for
> breaches of fiduciary duties owed to the Pension Plans under ERISA.

(Plan, p. 69).  Moreover Section 8.6 of the Plan provides:

>      8.6    Retiree Benefits.  Payment of any Retiree Benefits (as such
> benefits may have been modified during the Chapter 11 Case) shall be continued
> solely to the extent, and for the duration of the period, the Debtor is contractually
> or legally obligated to provide such benefits, *subject to any and all rights of the
> Debtor under applicable law* (including, without limitation, the Debtor's right to
> amend or terminate such benefits prior to or after the Effective Date).

>      The Debtor has established and maintained two (2) pension plans for its
> employees, known as the NOrthWestern Energy Pension Plan and the
> NorthWestern Pension Plans (collectively, the "Pension Plans").  The Pension
> Plans are single employer defined benefit plans covered by Title IV of the
> Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29
> U.S.C. § 1301 *et seq*.  The Pension Plans will not be terminated during the
> Debtor's Chapter 11 Case and the Debtor will continue to sponsor the Pension
> Plans after emerging from Chapter 11, assuming the Plan is confirmed.

>      The Pension Benefit Guaranty Corporation ("PBGC"), a United States
> Government corporation which guarantees the payment of certain pension benefits
> upon termination of a pension plan, has asserted that the Pension Plans may be
> underfunded on a termination basis.  The PSGC has filed contingent claims against
> the Debtor for underfunded benefit liabilities under 29 U.S.C. §§ 1362 and 1368;
> for unpaid minimum funding contributions under 28 U.S.C. § 1082 and 26 U.S.C.
> § 412; and for unpaid premiums under 29 U.S.C. § 1307.  The PBGC has asserted

9

that portions of these claims may be entitled to a priority. PBGC's claims are
contingent upon termination of the Pension Plans during the Chapter 11 Case.

(Plan, p. 63 (emphasis added)). I interpret "applicable law" to include state remedies and rights.

Also, contrary to NOR's position on executory contracts, the specific terms of Plan
foreclose such remedy for NOR or the Pensioners. Had NOR scheduled the Pensioners' benefits
as executory contracts, which it did not, except in one instance noted above, then NOR's Plan
required action on such executory contracts (assuming each agreement is an executory contract,
an issue I need not decide) because under the title "Executory Contracts" the Plan provides, in
relevant part:

> (b)    At least fifteen (15) days prior to the Voting Deadline (or such later
> date as the Bankruptcy Court may fix), the Debtor shall file schedules setting forth
> each of its executory contracts . . . to be assumed and assigned under this Plan and
> identifying those contracts and leases to be rejected . . . together with the cure
> amount(s), if any, to be paid respecting such executory contracts . . . . Any party
> who disputes the proposed cure amount must file an objection not later than the
> date fixed for filing objections to confirmation of this Plan and any dispute
> respecting such cure amounts will be determined by the Bankruptcy Court at the
> Confirmation Hearing or on such later date as the Bankruptcy Court may fix.

(Plan, p. 61). That Plan provision was not implemented with respect to these Pensioners.
Furthermore, Section 8.2 of the Plan sets a deadline for filing proofs of claims relating to
executory contracts and their rejection, which must be filed with the Court no later than thirty
days after notice of rejection.

The single fact of the matter is quite significant. None of the Pensioners were afforded
due process, in that none were served with rejection notices of their executory contracts in
accordance with NOR's Plan, even though, alarmingly, NOR, in its Motion to terminate the
pension benefits, acknowledged the MPC purchase agreement ("UPA"), Section 2.16(b), as to

10

the pension agreements "constitutes a legal, valid and binding agreement, enforceable in accordance with its terms of MPC" that NOR "shall maintain and shall be responsible for . . . all current and future obligations of MPC . . . under any supplemental pension benefit or benefit replacement or restoration plan, program or individual agreement maintained by MPC . . . ." The Motion then correctly asserts that "no individual who is a party to an MPC agreement has filed a proof of claim against the Debtor." Yet, NOR now wants to reject each individual agreement that it assumed and became liable to pay, at this late date, beyond the bar date NOR established in the Plan, as an executory contract, where, absolutely no notice or pleading was ever served upon any of the Pensioners prior to confirmation. Moreover, none of the Pensioners were even scheduled as unsecured creditors under Schedule "G" (except for Van Gelder) as a bearer of an executory contract subject to the provisions of section 365. Equally important, in answer to NOR's attempt to place the Pensioners' claims in Class 9 "General Unsecured Claims," such action would violate the Pensioners' right provided in Section 4.9(a) of the Plan. Section 4.9(a) provides: "Impairment and Voting. Class 9 is impaired by this Plan and holders of Allowed General Unsecured Claims are entitled to vote to accept or reject this Plan." (Plan, p. 39). None of the Pensioners were given the right to vote prior to confirmation because they were never sent notice of confirmation or mailed a ballot. It is simply too late to allow NOR to end run the right to vote on the Plan.

Simply stated, these Pensioners have not been afforded due process, by notice, or any other form in the NOR Plan reorganization effort. To now cast upon each of the Pensioners a jurisdictional premise before this Court in light of the above is simply beyond any standard of timely fairness and notice, which this Court cannot tolerate or condone. I remind NOR that:

11

> Confirmation not only discharges the debtor from its pre-confirmation debts, it also revests all of the property of the estate back in the debtor . . . . Importantly, while the plan binds pre-confirmation creditors, it does not bind post-confirmation creditors. . . . once the bankruptcy court confirms a plan of reorganization, the debtor is free to go about its business without further supervision or approval of the court, and concomitantly, without further protection of the court. A firm that has emerged from bankruptcy is just like any other defendant in a tort case: it must protect its interests in the way provided by the applicable non-bankruptcy law . . . .

*Southwest Marine Inc. v. Danzig*, 217 F.3d 1128, 1140 (9th Cir. 2000) (internal citations omitted). *See also Harstad v. First American Bank*, 39 F.3d 898 (8th Cir. 1994) (denying section 1142 jurisdiction to debtor when plan fails to provide for enforcement).

Moreover, each state court defendant, including NOR, is being sued for tort liability under Montana law. Much like the malpractice case present in *Resorts International*, and probably identical thereto, the court concluded, as do I: "For these reasons, there is no 'related to' jurisdiction over the malpractice dispute, and it cannot find a home in the Bankruptcy Court." 372 F.3d at 171. Likewise, there is no jurisdiction in this Court over the Pensioners' benefits that passed through the reorganization process without any attention or provision in the confirmed Plan, which by December 30, 2004, had been fully consummated.

Further, 28 U.S.C. section 1334(c)(1) provides:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State court or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Since there is a parallel State court proceeding pending regarding the pension termination and rights of the Pensioners, for the reasons set forth above, I deem it in the interest of justice and respect for State law to abstain in favor of the State Court Action.

12

The final issue raised by both parties is their request for award of attorney's fees and costs arising out of the Motion, Objection, Complaint and Response. As set forth above, this matter arises under the confirmation of the Plan and pertinent sections of the Bankruptcy Code on the vesting of property in the Reorganized Debtor. In sum, the issue of jurisdiction is decided under pertinent Bankruptcy Code provisions. *Agassi v. Planet Hollywood*, 269 B.R. 543 (D. Del. 2001), answers the issue on award of attorneys fees and costs.

> Attorney's fees are not independently recoverable under the Bankruptcy Code, but they may be recovered in bankruptcy proceedings under state law if the parties' contractual arrangement provides for the recovery of attorney's fees. . . . [S]everal courts have clarified this principle holding that "where the litigated issues involve not basic contract enforcement questions, but issues peculiar to federal bankruptcy law, attorney's fees will not be awarded absent bad faith or harassment by the losing party." . . .

> In sum, the Court concludes that the bankruptcy litigation pertaining to the assumption issue involved distinct federal issues under the bankruptcy code which are separate and apart from contractual enforcement issues . . . .

*Id.* at 552 (internal citations omitted). This entire matter involved whether this Court has jurisdiction to hear and decide the pension termination issues. Bankruptcy law alone determines that issue. I leave to the State court whether attorney's fees are recoverable in the State Court Action, and give no opinion on that matter. Accordingly, the present requests for the award of attorney's fees and costs are rejected.

A separate order shall enter.

Dated: May 4, 2005

Honorable John L. Peterson
United States Bankruptcy Judge

13